UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X
                                       :

CHAIM Y. KATZ, *et al.*,               :

                             :

                   Plaintiffs,    :

                             :         21 Civ. 2933 (JPC)

         -v-                  :

                             :        OPINION AND

                           :          ORDER

NEW YORK CITY HOUSING PRESERVATION &   :
DEVELOPMENT, *et al.*,            :

                             :

                  Defendants.    :

                             :
------------------------------------------------------------------------X

JOHN P. CRONAN, United States District Judge:

      Plaintiffs Chaim Katz and Channa Katz are a married couple whose Orthodox Jewish religious beliefs require them to have a large family. Twice they applied for affordable housing. And twice their application was denied because they exceeded the apartment's maximum occupancy limit. In this action, the Katzes claim that these apartment denials violated the Free Exercise Clause of the First Amendment, the Fair Housing Act, and state and city human rights laws. The Katzes concede that these occupancy limit policies are generally applicable. That concession dooms their Free Exercise claim: Defendants have shown a rational basis for the occupancy limits. As for their Fair Housing Act claim, the Katzes fail to adequately allege that the challenged policies have a disparate impact on either of their protected statuses: their Orthodox Jewish faith or being a family with children. With the Katzes having failed to sufficiently plead either of their federal claims, the Court declines to exercise supplemental jurisdiction over their state and city law claims. The Court grants Defendants' motions to dismiss. The Court, however,

will permit the Katzes to file an amended complaint within thirty days if they wish to seek to cure the pleading deficiencies identified herein.

## I. Background

### A.     Factual Allegations[1]

Chaim Y. Katz ("Mr. Katz") and Chana Katz ("Mrs. Katz") are a married Orthodox Jewish couple living in Manhattan's Lower East Side.  Compl. ¶¶ 2, 6, 7.  A central tenet of their faith is that they must "build large families" by "having many children."  *Id.* ¶¶ 2, 3, 17, 18.  Indeed, a 2013 Pew Research report found that Orthodox Jews ages forty to fifty-nine have an average of 4.1 children and that 48% of Orthodox Jewish families have four or more offspring.  *Id.* ¶¶ 19, 20. The Katzes claim that because Orthodox Jews have large families, they "are at an inherent disadvantage in applying for affordable housing."  *Id.* ¶ 21.

Two New York City agencies—the New York City Housing Preservation & Development ("HPD") and New York City Housing Development Corporation ("HDC")— help run affordable housing programs throughout the City.  *Id.* ¶¶ 8, 9, 22, 23.  These agencies operate an online lottery system ("Housing Connect") for people to apply for affordable housing units throughout the five boroughs.  *Id.* ¶¶ 22, 23.  On Housing Connect, building owners can advertise and accept applications for available units.  *Id.* ¶¶ 25, 50.  In reviewing applications, building owners must follow HDC occupancy guidelines.  *See id.* ¶¶ 45, 47.  Based on these guidelines, the Katzes were twice denied affordable housing because of their family size—once in the Essex Crossing Lottery and once in the Orchard Lottery.  *Id.* ¶¶ 34-36, 56.

---

[1] The following factual allegations, which are assumed true for purposes of this Opinion and Order, are taken from the Complaint, Dkt. 1 ("Compl."), exhibits attached to the Complaint, and documents incorporated by reference.  *See DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 110-11 (2d Cir. 2010); *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002).

1.  **Essex Crossing Lottery**

The Essex Crossing Lottery was a 2017 affordable housing lottery for 104 newly constructed units at 145 Clinton Street in the Lower East Side.  *Id.* ¶ 25.  Although Site 5 Residential Owner LLC ("Site 5") developed and owned the property, Site 5's management company C&C Apartment Management LLC ("C&C") ran the lottery.  *Id.* ¶¶ 26, 34-35.  The lottery was advertised on Housing Connect and stated a preference for Lower East side residents; fifty percent of the affordable units had to go to such residents.  *Id.* ¶ 27.

Around March 2, 2017, the Katzes timely applied for a three-bedroom apartment in the Essex Crossing Lottery through Housing Connect.  *Id.* ¶ 28.  When they applied, the Katzes' properly disclosed their family size and how many people would live in the apartment.  *Id.* ¶ 32.  At that time, their household had seven people: the Katzes and their five children, who were all under eighteen.  *Id.* ¶ 29.  They also disclosed that they would have only four children living in the apartment because one child planned to live elsewhere.  *Id.* ¶ 30.

After applying, the Katzes were originally "selected for the" lottery.  *Id.* ¶ 33.  But on July 21, 2017, C&C "reversed course" and denied their application because "[n]o remaining units [we]re available within the project to accommodate [thei]r household size."  *Id.* ¶¶ 34, 36.  That is because, for a three-bedroom apartment, the maximum occupancy limit was six individuals—two per bedroom.  *See id.*  ¶  21.  On July 30, 2017, the Katzes then timely appealed to Site 5, claiming that the three-bedroom apartment "was sufficient for the[ir] . . . needs" and that "their family size was the result of their fervent religious convictions."  *Id.* ¶¶ 37, 38.  Almost two months later, on September 25, 2107, Site 5, through C&C, denied the appeal because "the property did not have an available unit to accommodate the household size."  *Id.* ¶ 39 (cleaned up).

 Mr. Katz then submitted a complaint to HDC that made the same arguments as the appeal to Site 5.  *Id.* ¶ 40.  HDC denied the complaint on November 2, 2017.  *Id.* ¶ 41.  HDC explained

that it had "no . . . grounds" to "question or intervene in [the] owner's decision" denying the Katzes' application. *Id.*

Mr. Katz turned next to the New York State Division of Human Rights ("DHR") and the U.S. Department of Housing and Urban Development ("HUD"). *Id.* ¶ 42.  He filed a complaint with both agencies claiming that Site 5 discriminated against him based on his religion and familial status. *Id.*  Around March 27, 2019, DHR found that probable cause existed to believe that Site 5 engaged in an "unlawful discrimination practice" under New York state law. *Id.* ¶ 44, Exh. E. DHR also found that HPD and Site 5's "rule of limiting occupancy to two persons per bedroom may have a disproportionate impact on families with children and limit their housing opportunities." *Id.* ¶ 47.  DHR reached this conclusion, in part, because 145 Clinton Street had "adequate water, sewer, and electrical to service its residents" and the occupancy restrictions were more restrictive than the local city housing code. *Id.* ¶¶ 45-46.  Around November 30, 2020, DHR granted Mr. Katz's request to dismiss his complaint for administrative convenience because he wished to pursue his claims in federal court. *Id.* ¶¶ 48-49.

### 2.  Orchard Lottery

Two years after the Essex Crossing Lottery, the Katzes applied to the Orchard Lottery. *Id.* ¶ 52.  The Orchard Lottery also involved affordable housing units in the Lower East Side, this time at 118 Orchard Street. *Id.* ¶ 50.  NRT New York LLC ("NRT"), which does business as Citi Habitats, marketed and reviewed applications for this lottery. *Id.* ¶ 51.

Around September 1, 2019, the Katzes applied for a three-bedroom apartment at 118 Orchard Street. *Id.* ¶ 52.  At that time, their family household had eight people: two adults and six children under eighteen. *Id.* ¶ 53.  But again, one of their children planned to live elsewhere. *Id.* ¶ 54.  And much like the Essex Crossing Lottery, the Katzes' application was denied because of the lack of "units in the project that me[t] the Katz[es]' household size requirements." *Id.* ¶ 56.

4

So again, Mr. Katz appealed the decision, this time to NRT.  *Id.* ¶ 57.  NRT denied the appeal because the Katzes' household size exceeded the maximum household size for the unit.  *Id.* ¶ 59.  In denying the appeal, NRT claimed that it did "not set the rules of household size allowed in an apartment; HPD is the agency that does."  *Id.* ¶ 58.  Mr. Katz asked NRT to reconsider, but it denied the request.  *Id.* ¶¶ 60-61.

So Mr. Katz turned next to HPD.  He filed a complaint with HPD asking to overturn NRT's decision denying the Katzes' application for the Orchard Lottery.  *Id.* ¶¶ 62-63.  On December 16, 2019, HPD denied the request because it "did not find cause to overturn the decision."  *Id.* ¶ 63.

**B.    Procedural History**

The Katzes sued HPD, HDC, Site 5, C&C, and NRT on April 6, 2021. *Id.* ¶¶ 1, 15. They allege that Defendants violated the Fair Housing Act "by creating and implementing a policy and practice that had a negative disparate impact and disproportionate effect" against protected classes based on their religion and familial status.  *Id.* ¶¶ 81, 84.[2]  They also allege that Defendants violated their First Amendment rights by "exclud[ing] Orthodox Jewish families from obtaining subsidized housing."  *Id.* ¶ 89.  Lastly, the Katzes bring state and city law claims under New York State Executive Law section 296(5) and New York City Administrative Code section 8-101 alleging discrimination based on their familial status and religion.  *Id.* ¶¶ 71, 76.

---

[2] HPD with HDC (the "City Defendants") claim that the Essex Crossing Lottery and Orchard Lottery had different occupancy standards. *See* Dkt. 53 ("City Motion") at 22 n.17. But they admit that both standards, as adopted by the developers, had a two-person per bedroom occupancy limit. *See id.* at 22 n.17. Because the Court grants Defendants' motion to dismiss, it need not decide the effect, if any, of Essex Crossing Lottery's supposed discretion to modify the occupancy limit to allow one other person per apartment. *See id.* at 22 n.18. Nor does the Court need to decide whether it should take judicial notice of the City Defendants' documents showing this alleged discretion in setting the occupancy limit.

On October 29, 2021, the City Defendants, NRT, and Site 5 with C&C (the "Site 5 Defendants") each separately moved to dismiss. *See* City Motion; Dkt. 57 ("NRT Motion"); Dkt. 59 ("Site 5 Motion"). The Katzes opposed the motions on December 20, 2021, Dkt. 64 ("Opposition"), and Defendants each filed their replies on February 3, 2022, Dkt. 68 ("City Defendants Reply"); Dkt. 69; Dkt. 71.

## II.  Legal Standard

To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* A complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. In making this determination, the Court must "accept[] as true the factual allegations in the complaint and draw[] all inferences in the plaintiff's favor," *Biro v. Conde Nast*, 807 F.3d 541, 544 (2d Cir. 2015), but it need not "accept as true legal conclusions couched as factual allegations," *LaFaro v. N.Y. Cardiothoracic Grp., PLLC*, 570 F.3d 471, 475-76 (2d Cir. 2009).

### III.   Discussion[3]

**A.      Free Exercise Claim[4]**

The First Amendment's Free Exercise Clause, applicable to the states through the Fourteenth Amendment, says that "Congress shall make no law . . . prohibiting the free exercise" of religion.  U.S. Const. amend. I.  This Clause serves as a bedrock of the American system, protecting people of all faiths.  It protects people who "harbor religious beliefs inwardly and secretly."  *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2421 (2022).  It protects those who "live out their faiths in daily life through the performance of (or abstention from) physical acts."  *Id.* (quotations omitted).  And it guards against the state discriminating against people based on their religious beliefs.  A state can neither "exclude[] religious observers from otherwise available public benefits," *Carson v. Makin*, 142 S. Ct. 1987, 1996 (2022), nor "treat *any* comparable secular activity more favorably than religious exercise," *Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021).

Under the Supreme Court's precedents, whether a government policy violates the Free Exercise Clause turns on two questions.  First, does the policy disfavor acts only when they are

---

[3] Besides the substantive issues discussed below, the City Defendants alone argue that the Free Exercise Clause and Fair Housing Act claims do not satisfy Federal Rule of Civil Procedure 8(a).  *See* City Motion at 6-10.  That rule requires pleadings to "contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  "When a complaint fails to comply with [the Rule 8] requirements, the district court has the power, on motion or *sua sponte*, to dismiss the complaint or to strike such parts as are redundant or immaterial."  *Simmons v. Abruzzo*, 49 F.3d 83, 86 (2d Cir. 1995).  Rule 8 dismissals are, however, rare: they are "usually reserved for those cases in which the complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised."  *Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988).  The Court finds that the Complaint complies with Rule 8 because it gives Defendants fair notice of the grounds on which the Katzes seek relief under the Free Exercise Clause, the Fair Housing Act, and state and city law.

[4] Although City Defendants originally contended that the First Amendment claim was time-barred, *see* City Motion at 23, they withdrew that argument in their reply brief, *see* City Defendants Reply.  The Court therefore will not consider any untimeliness argument as to the First Amendment claim.

either religious in nature or because of their religious character?  If yes, the policy is "doubtless . . . unconstitutional." *Emp. Div., Dep't of Hum. Res. of Or. v. Smith*, 494 U.S. 872, 877-878 (1990). In that case—when "official expressions of hostility to religion" accompany laws or policies burdening free exercise—the Supreme Court has simply "set aside" the policies without further inquiry. *Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*, 138 S. Ct. 1719, 1732 (2018). Second, even if this overt animus is lacking, is the policy burdening religious exercise "neutral and generally applicable"?  *Fulton v. City of Philadelphia, Pa.*, 141 S. Ct. 1868, 1876 (2021).  If no, then the policy triggers strict scrutiny review.  *Id.* If yes, then the policy triggers only rational-basis review.  *Agudath Israel of Am. v. Cuomo*, 983 F.3d 620, 631 (2d Cir. 2020).

The Katzes do not claim that Defendants' policies disfavor acts only religious in nature or that Defendants otherwise showed overt animus in denying their applications or later appeals.  Nor do they claim that the maximum occupancy limit is not generally applicable.[5]  They thus ask the Court to apply rational-basis review to analyze the occupancy restrictions.  Opposition at 19-20 ("While the Plaintiffs do not allege intentional discrimination or religious animus on the part of the Defendants, the Plaintiffs do allege that the facially neutral policy has no rational basis and disparately affects followers of the Orthodox Jewish faith.").

Under this analysis, the occupancy limits need only be "rationally related to a legitimate state interest" to be upheld.  *Town of Southold v. Town of E. Hampton*, 477 F.3d 38, 54 (2d Cir. 2007) (cleaned up).  This test is highly deferential; courts hold statutes unconstitutional under this standard of review only in rare or exceptional circumstances.  *See Beatie v. City of New York*, 123 F.3d 707, 712 (2d Cir. 1997) (Courts "will not strike down a law as irrational simply because it

---

[5] Because the Katzes claim that the policies at issue are "facially neutral," Opposition at 19, they have waived any argument to the contrary.  The Court therefore assumes without deciding that this is so.

may not succeed in bringing about the result it seeks to accomplish, because the problem could have been better addressed in some other way, or because the statute's classifications lack razor-sharp precision."). Indeed, "any reasonably conceivable" legitimate governmental interest will do, which means the party challenging the policy "must 'negative every conceivable basis which might support it'" with a rational basis. *Sensational Smiles, LLC v. Mullen*, 793 F.3d 281, 284 (2d Cir. 2015) (quoting *Heller v. Doe*, 509 U.S. 312, 320 (1993)).

Here, the City has a legitimate state interest in preventing overcrowding in subsidized apartment units. And limiting a unit's occupancy to two people per bedroom is rationally related to that legitimate interest by setting a numerical cap on each apartment. *See City of Edmonds v. Oxford House, Inc.*, 514 U.S. 725, 733 (1995) (explaining that the purpose of "[m]aximum occupancy restrictions" "is to protect health and safety by preventing dwelling overcrowding").

The Katzes resist this conclusion by challenging where the City drew the line. They claim that some apartments can reasonably hold more than two people per bedroom. Opposition at 19-20; *see* Compl. ¶¶ 45-47. But that argument misunderstands rational-basis review. Occupancy limits will always require some line-drawing but that does not make those limits unconstitutional—rational-basis review does not require narrow tailoring. Indeed, the "restraints on judicial review" that rational-basis entails have "added force where the legislature must necessarily engage in a process of line-drawing." *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993) (quotations omitted). Therefore, applying rational-basis review, as the Katzes request, they have not pleaded that the occupancy limits violated their Free Exercise Clause rights.[6]

---

[6] Because the Court finds that the policy does not violate the Katzes' Free Exercise Clause rights, the Court need not reach whether the Katzes have sufficiently pleaded that NRT and the Site 5 Defendants are state actors. *See* Site 5 Motion at 6-10; NRT Motion at 5-7.

B.      **Fair Housing Act Claims**

The Court now turns to the Katzes' claim that Defendants violated the Fair Housing Act. The Fair Housing Act is meant "to provide, within constitutional limitations, for fair housing throughout the United States."  42 U.S.C. § 3601.  It accomplishes that goal by prohibiting discrimination in housing against people with certain protected characteristics, including a person's familial status and religion.  *Id.* §§ 3602(k), 3604.

The Fair Housing Act generally permits a plaintiff to allege discrimination under two theories: disparate treatment or disparate impact.  In a disparate treatment case, "a plaintiff must establish that the defendant had a discriminatory intent or motive."  *Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 524 (2015) (quotations omitted).  In a disparate impact case, a plaintiff must establish that the challenged practices "have a disproportionately adverse effect on minorities and are otherwise unjustified by a legitimate rationale."  *Id.* (quotations omitted).  So unlike a disparate treatment claim, "[a] plaintiff need not show the defendant's action was based on any discriminatory intent."  *Tsombanidis v. W. Haven Fire Dep't*, 352 F.3d 565, 575 (2d Cir. 2003), *superseded on other grounds as stated in Mhany Mgmt., Inc. v. Cnty. of Nassau*, 819 F.3d 581, 619 (2d Cir. 2016).  The Katzes allege a disparate impact theory for Defendants' liability under the Fair Housing Act.  *See* Compl. ¶ 81 ("Defendants violated the Fair Housing Act by creating and implementing a policy and practice that had a negative disparate impact and disproportionate effect on the Katz family due to their religious beliefs.").

To ultimately establish a *prima facie* disparate impact claim, a plaintiff must show "(1) the occurrence of certain outwardly neutral practices, and (2) a significantly adverse or disproportionate impact on persons of a particular type produced by the defendant's facially neutral

acts or practices." *Mhany Management, Inc.*, 819 F.3d at 617.  To properly allege a disparate impact case, the plaintiff "must first identify members of a protected group that are affected by the neutral policy and then identify similarly situated persons who are unaffected by the policy." *Tsombanidis*, 352 F.3d at 576-77.  Through this comparison, the plaintiff must plausibly allege "a significantly adverse or disproportionate impact" on a protected group of individuals.  *Id.* at 575. To meet this requirement, "plaintiffs *typically* rely on statistical evidence to show a disparity in outcome between groups."  *Mandala v. NTT Data, Inc.*, 975 F.3d 202, 209 (2d Cir. 2020) (emphasis added) (Title VII disparate impact case).  With that said, at the motion to dismiss stage, a plaintiff need not do so if other facts "plausibly give rise to an inference that the challenged policy causes a disparate impact."  *Winfield v. City of New York*, No. 15 Civ. 5236 (LTS), 2016 WL 6208564, at *6 (S.D.N.Y. Oct. 24, 2016) (explaining that at the motion to dismiss stage a plaintiff need not "proffer statistical evidence of disparate impact, if other facts are pleaded that support the inference"); *see Mill St. Partners, LLC v. City of Newburgh*, No. 18 Civ. 5465 (VB), 2019 WL 4274212, at *5 (S.D.N.Y. Sept. 10, 2019).

### 1.  Religious Discrimination

Here, the Katzes have failed to plausibly allege that the policies have created a disproportionate effect on Orthodox Jews because they never allege that the occupancy limits have or will result in an underrepresentation of Orthodox Jews in affordable housing lotteries in New York City.  That is because at no point does the Complaint compare Orthodox Jews applying for New York City affordable housing lotteries to similarly situated individuals.

To start with, the Katzes never allege the average or median household size of Orthodox Jews applying for affordable housing lotteries in New York City.  Instead, they only allege that "Orthodox Jewish individuals ages 40-59 have an average of 4.1 children in their lifetime" and

that 48% of Orthodox Jewish families have four or more children.  Compl. ¶¶ 19-20.  But those are nationwide averages, not averages for Orthodox Jews in New York City (let alone for those applying for affordable housing).  The Katzes fail to plead how the occupancy limits will affect the relevant demographic.

Yet even if the Court were to assume that the nationwide statistics track the demographics for Orthodox Jews applying for New York City affordable housing, it would not reflect the number of children that would on average live in an apartment.  The Complaint only alleges the average number of children that Orthodox Jews aged forty to fifty-nine have.  It never alleges how many children tend to live in an Orthodox Jewish household.  For example, the average Orthodox Jewish applicant in New York City may be older or younger than the forty to fifty-nine age group and thus have fewer children living with them.  Or the average New York City-based Orthodox Jewish applicant may be within that age group but be like the Katzes and not have all their children living with them.[7]

Besides failing to identify members of a protected group affected by the neutral policy, the Katzes never compare Orthodox Jews applying for New York City affordable housing to similarly situated individuals.  Instead, the Katzes compare the average number of children born to an Orthodox Jewish family to the average number of children "born to all other Jewish individuals in the United States."  Compl. ¶ 19.  That is not the correct comparator.  The Katzes need to compare their protected group to similarly situated individuals: those applying for New York City public housing.  *See Gorham-Dimaggio v. Countrywide Home Loans, Inc.*, 421 F. App'x 97, 100 (2d Cir.

---

[7] The Complaint also assumes, with no allegation supporting the assumption, that the average Orthodox Jewish household applying for New York City affordable housing has two parents living in the house.  *See* Compl. ¶ 21 ("[E]ven the average family, with 4.1 children, would exceed the maximum family size requirement of 6 individuals.").

2011) (affirming dismissal of a Fair Housing Act claim because the disabled plaintiff-debtor "failed to plausibly allege that she was treated differently than non-disabled debtors").

Even more problematic, the Katzes *never* allege that the occupancy limits have resulted in or predictably will result in Orthodox Jews being underrepresented in New York City's affordable housing units, such as through any allegations of facts or statistics suggesting such underrepresentation.  For example, the Complaint lacks any allegations about how many Orthodox Jewish families apply for or obtain housing in affordable housing lotteries in New York City.  Nor do they allege how many non-Orthodox Jewish families apply for and are denied housing because of their family size.   It is thus impossible to reasonably infer from the Katzes' allegations that the occupancy limits have caused or will cause underrepresentation among Orthodox Jews.

When as here, a complaint lacks statistical or factual allegations suggesting that other people in the protected class are actually or predictably disproportionately affected because of a neutral policy, courts have dismissed the claim.  For example, in *Hack v. President & Fellows of Yale College*, 237 F.3d 81 (2d Cir. 2000), the Second Circuit affirmed the dismissal of the plaintiffs' claim that Yale's policy requiring students to live in co-ed dormitories had a disparate impact on Orthodox Jewish students.  There—like here—the plaintiffs alleged that the policy "effectively prevents *them* from access to [the requested] housing."  *Id.* at 90 (emphasis added). But there—like here—the plaintiffs never alleged how the challenged policy would affect other members in the protected class.  *See id.* at 90-91.  So there—like here—the plaintiffs failed to allege that the challenged "policy has resulted in or predictably will result in under-representation of Orthodox Jews in [the challenged] housing."  *Id.* at 91.

### 2. **Familial Status**

The Katzes' familial status claim fails for much the same reasons.  Before discussing why, the Court begins by addressing a point of confusion in the parties' briefing.  Defendants note that at points the Complaint claims that the occupancy limits discriminate based on family size.  City Motion at 14; NRT Motion at 14; Site 5 Motion at 15.  And they point out that the Fair Housing Act prevents discrimination based on familial status, not family size.  All of this is true.  *See Borum v. Brentwood Vill., LLC*, 218 F. Supp. 3d 1, 22 (D.D.C. 2016) (collecting cases holding that family size is not protected by the Fair Housing Act); *Glover v. Crestwood Lake Section 1 Holding Corps.*, 746 F. Supp. 301, 310 (S.D.N.Y. 1990).  But the Complaint also alleges discrimination based on a permissible familial status: families with children.  Taking the Complaint in the best light, the Katzes seemingly claim that the occupancy limits have a disparate impact on families with children because such families will on average be larger than families without children.  *See* Compl. ¶¶ 82-84; Opposition at 8.  In other words, the Complaint does not only base its claim on family size, which would not count as a familial status, but also on families with children, which does count.

With that said, the Katzes claim still fails.  They allege *no* facts or statistical evidence showing a significantly adverse or disproportionate effect on families with children.  Indeed, they do not even allege the average family size for a family with children.  Nor do they compare families with children to families without children.  In the end, the Katzes include no allegations that the challenged policy resulted in or predictably will result in the underrepresentation of families with children.

\* \* \*

Accordingly, the Complaint fails to state a claim of disparate treatment in violation of the Fair Housing Act in New York City's affordable housing units, based on either religion or familial status. The Katzes' Fair Housing Act claim therefore is dismissed.[8]

## C.    State Law Claims

The Katzes also raise claims under New York State Human Rights Law and New York City Human Rights Law. Under 28 U.S.C. § 1367(c)(3), the Court may "decline to exercise supplemental jurisdiction over state law claims if it has dismissed all federal claims." *Tops Markets, Inc. v. Quality Markets, Inc.*, 142 F.3d 90, 103 (2d Cir. 1998). In determining whether

---

[8] Defendants also contend that the two-person bedroom occupancy limit falls within the Fair Housing Act's "absolute exemption" for "'restrictions regarding the maximum number of occupants permitted to occupy a dwelling.'" *City of Edmonds*, 514 U.S. at 731, 734 (quoting 42 U.S.C. § 3607(b)(1)); *see* 42 U.S.C. § 3607(b)(1) ("Nothing in this subchapter limits the applicability of any reasonable local, State, or Federal restrictions regarding the maximum number of occupants permitted to occupy a dwelling."). The Fair Housing Act provides a complete exemption for uniformly applied laws that meet these requirements because occupancy limits serve "to protect health and safety by preventing dwelling overcrowding." *City of Edmonds*, 514 U.S. at 733. But the parties cite no decisions resolving the reasonableness of occupancy limits at the motion to dismiss stage. And the Court's research has found a dearth of cases where a defendant even invoked section 3607(b)(1) in a motion to dismiss. *See Nernberg v. Borough of Sharpsburg, Pa.*, No. 14 Civ. 931, 2015 WL 1651011, at *7 (W.D. Pa. Apr. 14, 2015); *Moyer v. Lower Oxford Twp.*, No. 92 Civ. 3348, 1993 WL 5489, at *1 (E.D. Pa. Jan. 6, 1993). In both cases, the courts held that the reasonableness of the restriction presented a factual question that could not be resolved without discovery. *See Nernberg*, 2015 WL 1651011, at *7; *Moyer*, 1993 WL 5489, at *1. The Second Circuit also has yet to decide who bears the burden to prove that the exemption applies, although the Sixth Circuit has taken the view "that the party claiming the [section 3607(b)(1)] exemption carries the burden of proving its eligibility for the exemption and that exemptions from the Fair Housing Act are to be construed narrowly, in recognition of the important goal of preventing housing discrimination." *Fair Hous. Advocs. Ass'n, Inc. v. City of Richmond Heights, Oh.*, 209 F.3d 626, 634 (6th Cir. 2000) (cleaned up). The Court need not resolve these issues, however, given the Katzes' failure to adequately plead disparate impact.

The Site 5 Defendants and the City Defendants additionally contend that a portion of the Katzes' Fair Housing Act claim is time-barred. *See* City Motion at 22; Site 5 Motion at 10. Here too, because the Court dismisses the Katzes' Fair Housing Act claim on different grounds, it also need not decide the statute of limitations issue. *See Oti Kaga, Inc. v. S.D. Hous. Dev. Auth.*, 342 F.3d 871, 879 n.6 (8th Cir. 2003) (declining to consider Fair Housing Act statute of limitations argument).

to exercise supplemental jurisdiction, courts consider "the values of judicial economy, convenience, fairness and comity." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988). Considering these factors, the Court declines to exercise supplemental jurisdiction over the Katzes' state and city law claims. *See Brzak v. United Nations*, 597 F.3d 107, 113-14 (2d Cir. 2010) (explaining that in a typical case in which "a plaintiff's federal claims are dismissed before trial, the state law claims should be dismissed as well" (quotations omitted)).

**D.    Leave to Amend**

The Court next considers whether to grant leave to amend. Under Rule 15(a) of the Federal Rules of Civil Procedure, a court "should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). The Katzes have not asked the Court for leave to amend their Complaint. "But even when a party does not ask for leave to amend, the Court may grant leave to amend *sua sponte.*" *In re Garrett Motion Inc. Sec. Litig.*, No. 20 Civ. 7992 (JPC), 2022 WL 976269, at *18 (S.D.N.Y. Mar. 31, 2022) (quotations omitted) (collecting cases). When deciding whether to *sua sponte* grant leave to amend, "courts will consider many factors, including undue delay, bad faith or dilatory motive, repeated failure to cure deficiencies, undue prejudice to the opposing party, and futility." *Morales v. Kimberly-Clark Corp.*, No. 18 Civ. 7401 (NSR), 2020 WL 2766050, at *9 (S.D.N.Y. May 27, 2020). After considering these factors, the Court will grant the Katzes leave to file a First Amended Complaint because the Katzes could potentially plead facts that cure the Complaint's aforementioned defects, they have not previously amended the Complaint, and the case "is still in its infancy, [so] there would be minimal prejudice to Defendant[s] in permitting Plaintiff[s] to make one final amendment." *Id.* at *10 (quotations omitted).

### IV.  Conclusion

For the reasons above, the Court grants Defendants' motions to dismiss.  If the Katzes choose to do so, they have thirty days to file a First Amended Complaint.  Failure to file a First Amended Complaint within thirty days, and without good cause to excuse such failure, will result in the dismissal of the Katzes' claims with prejudice.

The Clerk of the Court is respectfully directed to close the motions pending at Docket Numbers 51, 54, and 56.

SO ORDERED.

Dated: August 8, 2022
     New York, New York

                               JOHN P. CRONAN
                      United States District Judge

17